# Exhibit 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------x
ROLAN GIBSON et al.,        :
                            :
        Plaintiffs,         :
                            :
                            :
        v.                  : No. 1:06CV00551
                            :
UNITED STATES               :
OF AMERICA et al.,          :
                            :
        Defendants.         :
------------------------x

                                Washington, D.C.

                                Wednesday, March 7, 2007

Telephonic deposition of

                ROLAN GIBSON

Plaintiff, called for examination by counsel for Defendant United States of America pursuant to notice and agreement of counsel, beginning at approximately 10:56 a.m. at Beta Court Reporting, 1140 Connecticut Avenue, NW, Washington, D.C., before Jonathan Zilinski of Beta Court Reporting, notary public in and for the District of Columbia, when were present on behalf of the respective parties:

Page 6

1 understand the question. But if you answer
2 the question, is it fair to say that I can
3 conclude that you understood the question?
4   A   Yes.
5   Q   Are you on any medications today?
6   A   No.
7   Q   Any other reason why you couldn't
8 give full and complete answers to my
9 questions?
10   A   No, ma'am.
11   Q   You've never been deposed before.
12 Have you ever been a witness in a courtroom
13 proceeding?
14   A   No.
15   Q   Aside from this lawsuit, have you
16 ever been a plaintiff in any lawsuit?
17   A   No, ma'am.
18   Q   Have you been a defendant in any
19 lawsuit?
20   A   No, ma'am.
21   Q   What did you do to prepare for your
22 deposition today?

Page 7

1   A   Me and my lawyer, we discussed a
2 few things.
3   Q   I don't want to know about the
4 contents of your conversation at all. When
5 you say your lawyer, you're referring to
6 Mr. DuBoff?
7   A   Yes.
8   Q   For how long did you meet with
9 Mr. DuBoff?
10   A   Today?
11   Q   Total amount of time that you've
12 met with him in preparation for your
13 deposition.
14   A   A little over an hour.
15   Q   And did you review any documents?
16   A   Yes.
17   Q   Are those the documents that are in
18 front of you?
19   A   Yes.
20   MS. JOHNSON:  And Joel, those are
21 documents that have already been provided to
22 us or that are from this case in discovery?

Page 8

1   MR. DuBOFF:  Yes, these are
2 documents. In fact, the police report that's
3 somewhat under investigation and it's the MPD
4 police reports.
5   Mr. Vricos provided them.
6   BY MS. JOHNSON:
7   Q   Have you talked with anyone else
8 regarding your testimony today?
9   A   No, ma'am.
10   Q   Have you had any conversations with
11 Mr. Hawkins regarding your testimony?
12   A   No.
13   Q   Do you have any documents in your
14 possession that you believe are related to
15 this lawsuit that have not been given to your
16 attorney?
17   A   No.
18   Q   You live at 6021 Clay Street, NE,
19 currently?
20   A   Yes.
21   Q   Is that where you were residing as
22 of December 8, 2004?

Page 9

1   A   Yes.
2   Q   And I want to walk through what
3 happened on that day. Roughly what time was
4 it that you were sitting in your vehicle at
5 the intersection of 61st and Clay Street on
6 December 8, 2004?
7   A   It was roughly 3:30.
8   Q   Were you driving your own vehicle?
9   A   Yes.
10   Q   Was the vehicle registered in your
11 name?
12   A   No, not at the time.
13   Q   Do you know whose name the vehicle
14 was registered in?
15   A   Mr. Carl Pilgrim.
16   Q   Who is Mr. Pilgrim?
17   A   The person who I purchased the car
18 from.
19   Q   When did you purchase the car?
20   A   A few days before the accident.
21   Q   How much did you pay to purchase
22 it?

Page 14

1  MR. DuBOFF: Sure.
2  THE WITNESS: It'll be Ys all over
3  this paper.
4  BY MS. JOHNSON:
5  Q  So were they going from east to
6  west?
7  A  They were going from east to west,
8  from west to east, from south to north, and
9  north to south.
10  Q  So they were going basically in all
11  of the directions possible on that four-way
12  intersection?
13  A  Yes.
14  Q  What did you do when you saw the
15  vehicles?
16  A  Stopped.
17  Q  You mean you stopped at a stop
18  sign?
19  A  No, that was before the crosswalk,
20  I stopped.
21  Q  The stop sign is before or after
22  the crosswalk?

Page 15

1  A  The stop sign is after the
2  crosswalk.
3  Q  It's after the crosswalk?
4  A  Yes.
5  Q  So you came to a stop before the
6  crosswalk, is that what you're saying?
7  A  Yeah.
8  Q  And then what happened next?
9  A  I stayed there, and the emergency
10  vehicles were coming to the intersection and
11  going through the intersection.
12  Q  And they were not stopping at the
13  stop sign?
14  A  No.
15  Q  So after you saw the emergency
16  vehicles, was there a time when all the
17  emergency vehicles had left from the
18  intersection, from the four-way intersection?
19  A  No.
20  Q  Did some of the vehicles stop?
21  A  Not in the intersection.
22  Q  Did any vehicles stop on Clay

Page 16

1  Street in this intersection section?
2  A  No.
3  Q  Did they stop on 61st Street?
4  A  No.
5  Q  I need you to tell me exactly what
6  happened, step-by-step, after you saw all of
7  the vehicles going in and out of the
8  intersection.
9  A  After that, after the cars -- after
10  the emergency vehicles were going in and out
11  of the intersection, shots were fired, and it
12  was just -- I was -- I didn't know what to
13  do. So I looked to my right in the direction
14  that I heard the shots come from. And when I
15  turned my head back around to look up, I just
16  saw two vehicles -- two of the police
17  vehicles -- meet each other at the
18  intersection, and it happened. They crashed
19  into me like it was -- it's one of the worst
20  experiences I've ever (inaudible) turning my
21  head, seeing these two cars coming at me
22  almost full speed, crashing into me.

Page 17

1  Q  The two cars that crashed into you,
2  did you see either of them approach the
3  intersection?
4  A  Yes.
5  Q  One of the cars was an MPD cruiser;
6  is that correct?
7  A  Yeah.
8  Q  And one was an unmarked blue car.
9  A  Yeah.
10  Q  Do you know which car came to the
11  intersection first?
12  A  No.
13  MS. JOHNSON: What I'm going to
14  show you, Mr. Gibson, are your responses to
15  interrogatories that you submitted to the
16  District of Columbia.
17  And this will be Exhibit 2.
18  (Deposition Exhibit No. 2 was
19  marked for identification.)
20  BY MS. JOHNSON:
21  Q  What I'm going to ask you to look
22  at is page 5, it's number 5. You can read

**Page 18**

1  the question and the answer, and then I just
2  have a few questions for you.
3      A   Okay.
4      Q   In your response to Interrogatory
5  No. 5, you state that you saw a lot of police
6  cars with their lights and sirens and then
7  you saw one marked police car coming
8  westbound on Clay Street, NE.
9          Would that be the vehicle that
10 later collided with your car?
11     A   Both cars collided with my car.
12     Q   Right, but I'm just referring to
13 the one. In your interrogatory response, you
14 indicate there was one marked police car
15 coming westbound, so I believe westbound
16 would be going this way. Yes, coming
17 westbound on Clay Street, NE.
18     A   Yes.
19     Q   Could you mark on this diagram with
20 a P where you saw the marked police car?
21     A   I can't, because by the time I
22 looked up, I didn't know which direction the

**Page 19**

1  marked car was coming from or which direction
2  the other car. I just saw both of the cars
3  in the middle of the intersection at the same
4  time.
5      Q   Okay. So in your interrogatory
6  response, when you say you observed one
7  marked police car coming westbound and one
8  car coming northbound, that's not completely
9  accurate, because you only saw them when they
10 were actually in the intersection.
11     A   Some of that is accurate,
12 because -- I must have said that because the
13 marked police car was on the
14 passenger's -- I mean, on the driver's side
15 of my vehicle, so --
16     Q   And when you say it was on the
17 driver's side of your vehicle, is that after
18 it had collided with your car?
19     A   Yes.
20     Q   But in terms of before the
21 collision, you didn't see that car that later
22 collided with your car before it entered the

**Page 20**

1  intersection?
2      A   No.
3      Q   You saw it when it was actually in
4  the intersection?
5      A   Yes.
6      Q   And as it concerns the unmarked
7  car, you didn't see that car prior to when it
8  entered the intersection?
9      A   Yes, I did.
10     Q   You saw the unmarked vehicle prior
11 to when it entered the intersection?
12     A   I saw the unmarked car as it
13 was -- yes, as it was -- as it entered the
14 intersection, yes.
15     Q   Could you put a PP for where you
16 saw the unmarked car when it was going into
17 the intersection?
18         Okay. And you saw that car before
19 you saw the MPD vehicle, the marked vehicle?
20     A   (inaudible)
21     Q   You saw the MPD vehicle before you
22 saw that vehicle? I'm talking about the MPD

**Page 21**

1  vehicle that --
2      A   Cruiser.
3      Q   Collided with your car.
4      A   Everything happened so fast, I
5  looked up and saw them at the same time,
6  actually.
7      Q   But you did see the unmarked car in
8  the intersection before it collided with your
9  car?
10     A   Both of them.
11     Q   So could you put a DC for where you
12 saw the marked cruiser?
13         MR. DuBOFF: I'm going to object
14 and just ask that you instruct him on exact
15 time frame of when he saw that car in that
16 position.
17         MS. JOHNSON: You can ask him all
18 the questions you want, Joel, when it's your
19 turn.
20         MR. DuBOFF: Okay. I'm just going
21 to object on vagueness then.
22         MS. JOHNSON: Okay, that's fine.

Page 26

1  Q  Was that still minutes before the
2  gunshots?
3  A  No.
4  Q  Was it after the gunshots -- you
5  had heard the gunshots?
6  A  Yes.
7  Q  You saw the Park Police vehicle
8  come after the gunshots?
9  A  Yes.
10 Q  And when did you see the MPD
11 cruiser that collided with your car?  Was it
12 before you heard the gunshots?
13 A  No.
14 Q  Was it after you heard the
15 gunshots?
16 A  Yes.
17 Q  Do you know whether you saw the MPD
18 cruiser before you saw the Park Police
19 cruiser?
20 A  No, it was at -- I saw both of the
21 cars at the same time.
22 Q  So how long after the gunshots did

Page 27

1  you see the two cruisers?
2  A  A few seconds.
3  Q  And you can't tell which one came
4  to the intersection first?  You don't
5  remember.
6  A  No, ma'am.
7  Q  And you were still sitting in your
8  car.  You said you looked to your right,
9  which was in the direction of where you had
10 heard the gunshots?
11 A  Yes.
12 Q  And you looked back.  When you
13 turned to look back, what happened next?
14 A  That's when both of the cars
15 crashed into me.
16 Q  And you didn't see -- do you know
17 which car hit you first?
18 A  No.
19 Q  No?
20 A  No.
21 Q  They both hit you.  Where did the
22 MPD cruiser hit you?

Page 28

1  A  I'm not sure, because it was three
2  different impacts after -- I was knocked
3  unconscious, so I don't remember where the
4  MPD car hit me.
5         MS. JOHNSON:  Let me show
6  you -- this will be Exhibit 3.
7         (Deposition Exhibit No. 3 was
8         marked for identification.)
9         BY MS. JOHNSON:
10 Q  What I've just placed in front of
11 you as Exhibit 3, Mr. Gibson, is a witness
12 statement that was taken by the Metropolitan
13 Police Department.  I'll ask that you read
14 through it.  I just have a few questions.
15        MR. DuBOFF:  For the record, I
16 asked him to read it through twice because
17 sometimes you don't always get it the first
18 time.
19        MS. JOHNSON:  That's fine.
20        THE WITNESS:  Okay.
21        BY MS. JOHNSON:
22 Q  Just right now, I just want to look

Page 29

1  at the last sentence of that statement.  You
2  said that you were "hit from front by a Park
3  Police, then DCMPD also hit front of my car."
4         So my question to you is whether or
5  not you actually saw that you were hit in the
6  front of the car by the Park Police.
7  A  No.
8  Q  Did you see the DCMPD hit the front
9  of your car?
10 A  No.
11 Q  And your testimony today is that
12 you were knocked unconscious as soon as the
13 cars impacted with you?
14 A  Yes.
15 Q  Do you recall, when you saw the
16 D.C. Park Police vehicles in the
17 intersection, before they hit you, whether or
18 not they had emergency lights on?
19 A  No.
20 Q  You don't recall whether the
21 D.C. --
22 A  Yeah, I'm sorry.  Excuse me, I do

Page 30

1 recall.
2   Q   Did the D.C. cruiser have its
3 emergency lights on when you saw it in the
4 intersection before it hit your car?
5   A   No.
6   Q   It did not?
7   A   No.
8   Q   Did the Park Police vehicle have
9 any emergency lights activated before it hit
10 you?
11   A   No.
12   Q   Were you wearing your seatbelt at
13 the time that you were parked at the
14 crosswalk?
15   A   Yes, ma'am.
16      MR. DuBOFF: Objection as to
17 relevance.
18      You can answer, which he has.
19      BY MS. JOHNSON:
20   Q   So after the impact, you were
21 unconscious. What's the next thing that you
22 remember?

Page 31

1   A   The next thing I remember is
2 Mr. Hawkins shaking me -- I guess trying to
3 wake me back up.
4   Q   Were you still in your vehicle?
5   A   Yes.
6   Q   Did you wake up at that time?
7   A   No, I didn't -- I wasn't fully
8 coherent with what was going on.
9   Q   And then what happened?
10   A   And he reached in and -- making
11 sure I was okay and he pulled me from the
12 passenger's side, pulled me across the car
13 out of the car.
14   Q   When he pulled you out of the car,
15 were you aware whether there was an ambulance
16 that had come to the scene?
17   A   No.
18   Q   Before he pulled you out of the
19 car, did any MPD officers come and ask you
20 any questions?
21   A   No.
22   Q   So he pulled you out of the car,

Page 32

1 and were you just lying on the sidewalk?
2   A   Yes, I seem to remember laying in
3 the grass there (inaudible).
4   Q   What do you remember happening
5 then?
6      REPORTER: I didn't hear his last
7 answer.
8      BY MS. JOHNSON:
9   Q   Sorry. Could you repeat your last
10 answer, Mr. Gibson.
11   A   What was the last question?
12   Q   I said after he pulled you out of
13 the car, you were just lying on the ground?
14   A   Yes.
15   Q   I believe you said you were lying
16 on the grass.
17   A   Yes. In the grass, on the ground,
18 yes.
19   Q   Thank you.
20      What do you remember happening
21 next?
22   A   After that, Mr. Hawkins stayed

Page 33

1 there with me. I guess to see how badly I was
2 hurt. And an MPD officer had come over and
3 he asked me not to move, and he was checking
4 to see how badly I was injured.
5      I remember him calling -- actually
6 I don't know if he called or someone called
7 an emergency vehicle to come pick me up or
8 check me, make sure I was okay, or how badly
9 I was hurt.
10   Q   The MPD officer was a male?
11   A   If I can remember correctly, yes.
12   Q   Do you remember a female MPD
13 officer coming to you before you got out of
14 the car and asking any questions?
15   A   No.
16   Q   So the MPD officer asked if you
17 were okay. Were you able to answer him?
18   A   No.
19   Q   Do you know if Mr. Hawkins answered
20 for you?
21   A   No, I don't know.
22   Q   But you were aware that the MPD

Page 74

1   answers to interrogatories, which --
2       MS. JOHNSON: And I can ask him
3   about it, but he's not said it. I know you
4   like to talk, but I'm not deposing you today.
5       MR. DuBOFF: I'm trying.
6       MS. JOHNSON: Thank you.
7       BY MS. JOHNSON:
8   Q   Can you estimate for me the value
9   of the clothes that were cut off of you?
10  A   The clothes that were cut were
11  approximately $300.
12  Q   Were they given back to you after
13  they were taken off of you?
14  A   Yes.
15  Q   And do you have them?
16  A   I don't -- no, I don't.
17  Q   Why were the clothes cut off of you
18  at the hospital? Do you know?
19  A   To check (inaudible) -- actually,
20  they weren't cut off at the hospital.
21  Q   Where were they cut?
22  A   I believe in the emergency vehicle.

Page 75

1   Q   Do you know why they were cut off?
2   A   I'm guessing to check and make sure
3   that everything was okay with my arm, no cuts
4   or internal bleeding or bruising.
5   Q   And the transportation you were
6   talking about, that was back and forth to the
7   therapy sessions and the doctors' offices?
8   A   Yes.
9   Q   Was there any other transportation
10  aside from that transportation that you're
11  talking about?
12  A   Back and forth to work.
13  Q   How far is your job from where you
14  live?
15  A   Approximately 10 miles.
16  Q   So how do you get there?
17  A   Public transportation.
18  Q   You take a Metro or a bus?
19  A   Yeah.
20  Q   Which one?
21  A   Both.
22  Q   A Metro and a bus?

Page 76

1   A   Yeah.
2   Q   How were you getting to your job
3   before the accident?
4   A   I was driving my vehicle.
5   Q   Did you have to pay for parking?
6   A   No.
7   Q   And you said medications. Do you
8   know approximately how much you've spent on
9   medications?
10  A   Approximately $200.
11  Q   Do you have receipts for those
12  expenses?
13  A   I don't have all of them, but I
14  do -- I might be able to find a few of them.
15  Q   Well, if you are able to find any
16  of them, please turn them over to your
17  counsel so he can provide them to us. And
18  your counsel said for you that you have
19  incurred damage because of your car. Do you
20  know how much the car was worth?
21  A   Yeah.
22  Q   How much was the car worth?

Page 77

1   A   A little over $5,000.
2   Q   What kind of car was it?
3   A   It was a 1992 Chevy Caprice.
4   Q   How long had you had it before the
5   accident?
6   A   Approximately a few days.
7   Q   So it was not registered in your
8   name on the date of the accident?
9   A   No.
10  Q   Did you ever register the car in
11  your name?
12  A   No.
13  Q   Do you know what happened to the
14  car after the accident?
15  A   No.
16      MR. DuBOFF: You can be more
17  expansive on telling her what happened.
18      MS. JOHNSON: Joel, really, stop
19  it, okay? Please. Okay?
20      MR. DuBOFF: Well, I think he's
21  being very precise.
22      MS. JOHNSON: That's fine. That's

Page 82

1    do about it.
2         And I called and reported the car
3    stolen, and I guess it was put in the system
4    as stolen, but nothing ever came up.
5    Q    So aside from the clothes, the
6    transportation, the medications, and the 1992
7    Chevy Caprice, were there any other damages
8    that you felt were a result of this accident?
9    Any other losses you suffered?
10        MR. DuBOFF: Objection to the form
11   of the question.
12        You may try and answer.
13        THE WITNESS: Yeah.
14   BY MS. JOHNSON:
15   Q    What else?
16   A    Losses as far as -- I mean, it's
17   just -- it was a real inconvenience not
18   having a vehicle and being banged up, trying
19   to find rides to the therapy, to the
20   doctor's, (inaudible) just things you do,
21   things that I do on a day-to-day basis.
22        MS. JOHNSON: I would like you to

Page 83

1    take Exhibit 2 and Exhibit 4. If you look at
2    Exhibit 2, number 22, it begins on the bottom
3    of page 11 and goes on to page 12. And then
4    if you would also look at Exhibit 4,
5    number 9, it starts on the bottom of page 4.
6         MR. DuBOFF: Page 9?
7         MS. JOHNSON: No. Page 4,
8    number 9.
9         THE WITNESS: Okay.
10   BY MS. JOHNSON:
11   Q    My first question is the total loss
12   that you have listed in Exhibit 4 is $3,800,
13   and the total loss you have listed in
14   Exhibit 2 is $8,800. I just want to ask why
15   the discrepancy. To your knowledge, why
16   would two different amounts be reported as
17   being the total loss?
18   A    Because of the -- when I got home
19   and added up all the receipts for the clothes
20   and the car, it came back up. It was a
21   little bit more than what I thought it was.
22   Q    That's $5,000 more. So you're

Page 84

1    saying the clothes and what else?
2    A    The value of the car and the
3    medical bills and the -- I mean, the
4    medications.
5    Q    Was $5,000 more?
6    A    Yeah.
7         MR. DuBOFF: Objection. I don't
8    think -- listen to the question before you
9    answer. Could you ask the question again?
10   Because I think he answered before you
11   finished your question.
12        BY MS. JOHNSON:
13   Q    I'm asking you -- let me just also
14   have you look at the last pages of both
15   exhibits, okay? So that will clear it up.
16   Exhibit No. 4, it indicates that it was sent
17   on November 1, 2006 -- well, there's no year,
18   but I represent that I received it in 2006
19   based on the fax at the top of the page. And
20   Exhibit No. 2 is dated the 1st of January
21   2007.
22        And my question to you, sir, is

Page 85

1    whether between November 2006 and January 1,
2    2007, you discovered an additional $5,000 in
3    damages?
4         MR. DuBOFF: Objection. I don't
5    believe it's (inaudible) more than he had
6    already. It looks like a calculation
7    problem.
8         THE WITNESS: Yeah.
9         BY MS. JOHNSON:
10   Q    I just want to be clear. Is it
11   your testimony that after sending in this
12   answer in November, you later discovered that
13   in fact, your expenses were $5,000 more?
14   A    Yes, that's why I didn't give an
15   exact price, I gave an approximate price.
16   Q    Exactly.
17   A    Yes.
18   Q    And in Exhibit No. 2, you list the
19   car value at $2,500, but yet you have
20   testified today that it was worth
21   approximately $5,000. So which one is
22   accurate?

102

1   A   No.
2   Q   Just give me one minute.
3       We've been provided by Mr. DuBoff
4   with a picture of your hand when it was in a
5   splint, as you described afterwards.
6       Was that a soft splint or was it
7   hard material?
8   A   It was hard material under the
9   bandage, so it was kind of stiff, yes.
10  Q   Could you get it wet?
11  A   No.
12  Q   Could you take it off if you wanted
13  to?
14  A   Yes.
15  Q   You could take it off?
16  A   Yes.
17  Q   How would you take it off?
18  A   I guess unwrap the bandage. I was
19  told not to take it off.
20  Q   It didn't have a zipper on the
21  underside or anything like that?
22  A   No.

103

1   Q   No, okay.
2       MR. DuBOFF: While you're
3   thinking --
4       MR. VRICOS: Off the record for one
5   second.
6       (Recess)
7       BY MR. VRICOS:
8   Q   You said you saw an unmarked
9   vehicle at some point?
10  A   Yes.
11  Q   When you were sitting at the
12  intersection?
13  A   Yes.
14  Q   What was the color of that?
15  A   When I was sitting there, actually,
16  I saw a lot of unmarked vehicles.
17  Q   You saw one that was in an
18  accident, though; correct?
19  A   Yeah.
20  Q   What color was that?
21  A   Like a dark blue, navy blue.
22  Q   Can you approximate how quickly

104

1   that car was traveling when it entered the
2   intersection?
3   A   More than -- estimate, maybe like
4   anywhere from 60 to 75 miles an hour.
5   Q   And did you notice whether it had
6   its lights and sirens on?
7   A   No, didn't notice that it did.
8   Q   Is it possible that you don't
9   recall?
10  A   Yes.
11  Q   And you said that there was another
12  car involved in the accident; correct?
13  A   Yeah.
14  Q   And that was the MPD cruiser?
15  A   Yeah.
16  Q   And can you approximate how fast
17  that was traveling?
18  A   It had to be around the same speed.
19  Around the same speed.
20  Q   How long did you have to observe
21  these two cars when they entered? You said
22  earlier in your testimony that you looked

105

1   right after you heard shots fired; is that
2   correct?
3   A   Yes.
4   Q   And then you looked toward the
5   intersection again and saw what happened.
6   A   Yes, everything just happened so
7   fast, it was like I looked to my right and
8   when I turned my head back around, it was
9   just -- that's when everything happened. I
10  just -- cars, I saw cars spinning around, and
11  after that, it was just -- I don't know. I
12  don't recall.
13      MR. DuBOFF: I don't think he
14  answered the question. I think it was just
15  how long.
16      THE WITNESS: Right.
17      BY MR. VRICOS:
18  Q   So how long did you have an
19  opportunity to observe, would you say?
20  A   Like two to three seconds.
21  Q   And in that time, you were able to
22  sort of estimate how quickly the cars were

106

1 traveling?
2    A   Yeah, because all of the cars in
3 the area were traveling at very high speeds,
4 so it was -- that's all it takes, a split
5 second, for you to look up and your life's
6 flashing in front of you. You've got two
7 speeding cars look like they're out of
8 control just coming right at you.
9    Q   When you looked up, what did you
10 see? Did you see the way the cars actually
11 hit each other?
12    A   Not exactly, no.
13    Q   Do you know which car struck the
14 other car first?
15    A   No.
16    Q   Did you see either car coming
17 towards you?
18    A   Prior to the crash, no, I
19 don't -- I was looking in the opposite
20 direction. And like I say, when I turned my
21 head back --
22    Q   In that very short time period,

107

1 after the cars collided and before your car
2 was struck, did you see which car was coming
3 towards you closest?
4    A   The closest car to me I would say
5 would be the D.C. car.
6    Q   The D.C. car? What do you base
7 that on? On what you observed after the
8 accident or what you observed right before
9 you were struck?
10    A   Like right before I was struck.
11    Q   What part of the car did you see
12 right before you were struck? You said the
13 D.C. car.
14    A   What part of the car?
15    Q   Yes.
16    A   I'm not sure. It happened so fast
17 I'm not sure what part of the car it was.
18    Q   Is it possible that -- do you know
19 for sure which car struck your car first?
20    A   No, I don't know for sure, no.
21    Q   You said that in a basketball
22 accident, you hurt your wrist before?

108

1    A   Yes.
2    Q   Was that a break?
3    A   No, it wasn't a break.
4    Q   Was it described to you as a
5 fracture?
6    A   No.
7       MR. VRICOS: I don't have anything
8 else.
9       EXAMINATION BY COUNSEL FOR PLAINTIFFS
10      BY MR. DuBOFF:
11   Q   Is it my understanding that you're
12 saying that as a result of this motor vehicle
13 collisions, forgetting the medical bills and
14 the medical treatment, that you're asserting
15 that $8,800 is all of your expenses for the
16 car, for the transportation, for your
17 clothing, for your spine medications, and
18 various and sundry other things?
19      Does that sound about right?
20   A   Yes.
21   Q   And your lost wages is different
22 than that?

109

1    A   Yeah.
2    Q   And your medical bills are in
3 addition to that?
4    A   Yeah.
5    Q   And no one's asked what you think
6 the value is for the pain, physical pain, and
7 the mental suffering you've gone through.
8      Is that fair to say?
9    A   Yeah.
10   Q   Did any police officer come over to
11 you and apologize or say they were sorry
12 about the accident?
13   A   Yeah.
14   Q   Which one?
15   A   The D.C. officer that came up and
16 took the statement at George Washington.
17   Q   What did he say, and in what
18 context did he speak to you?
19   A   He was a pretty well-mannered young
20 man. He came up and he was concerned about
21 my well-being, and he apologized a few times
22 about what happened and seemed pretty

110

1  concerned.
2      Q   What did he say about apologizing?
3  How did he put it?
4      A   He was sorry that I had to go
5  through this, go through --
6      Q   Did he explain to you how the
7  accident had happened, or why your car was
8  stopped, parked, whatever, and why it was
9  hit?
10     A   No.
11     Q   Did he have a tape recorder?
12     A   Not to my knowledge.
13     Q   Did he ask you if he could record
14 anything?
15     A   No.
16     Q   When he provided to you this I
17 guess piece of paper to sign, I assume, is it
18 fair to say, this Exhibit 3, this is not your
19 normal signature?
20     A   No.
21     Q   Which hand did you write with?
22     A   My right.

111

1      Q   How were you feeling in your right
2  hand when you wrote that?
3      A   I was pretty out of it. I was
4  dazed and kind of confused for the most part.
5  I knew what was going on, but I really didn't
6  know what was going on.
7      Q   Were you ever consulted or
8  contacted by anybody from the U.S. Park
9  Police or anybody from the federal government
10 about what happened in this case?
11     A   No, I don't think so.
12     Q   Did anybody call you from the U.S.
13 Park Police or anybody of that nature to ask
14 you about what you saw and what you heard or
15 what you observed?
16     A   No.
17     Q   You were asked about your motor
18 vehicle, the one which Mr. Pilgrim sold you.
19 When he sold it to you, did he give you the
20 registration or what we call a pink slip or
21 anything of that nature?
22     A   Yes.

112

1      Q   Was that in the car at the time of
2  the accident?
3      A   I believe it was, yes.
4      Q   Did anyone from Metropolitan Police
5  Department or Park Police ever advise you or
6  tell you where your car was after the
7  accident?
8      A   No.
9      Q   Even the nice MPD officer didn't
10 tell you where your car was?
11     A   No.
12     Q   Did anyone else ask a statement of
13 you besides the officer who wrote some of
14 these things down in Exhibit No. 3?
15     A   No.
       MR. DuBOFF: No further questions.
17     FURTHER EXAMINATION BY COUNSEL FOR
18     DEFENDANT UNITED STATES OF AMERICA
19     BY MS. JOHNSON:
20     Q   I just have one or two follow-up
21 questions. This is Michelle Johnson again
22 from the U.S. Attorney's Office. Mr. Gibson,

113

1  are you left-handed or right-handed?
2      A   Right-handed.
3      Q   So during the time after the
4  accident, you still had full use of your
5  right hand?
6      A   Yes.
7      Q   And Mr. DuBoff referred to physical
8  pain and suffering that you had as a result
9  of the accident. Did you see any doctor
10 regarding any emotional pain and suffering
11 that you may have had?
12     A   No.
13     MS. JOHNSON: No further questions.
14     MR. VRICOS: No questions on
15 anyone's part.
16     MR. DuBOFF: Jonathan, I'd like him
17 to read, please.
18     REPORTER: Okay.
19     MR. DuBOFF: You'll notify me?
20     REPORTER: Yeah.
21     MR. DuBOFF: Or notify him? I
22 don't know if you can notify him, but you'll