# Plaintiffs' Exhibit Number

# 6

# Deposition of Officer Watkins

COPY

1

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLUMBIA
 3
 4   - - - - - - - - - - - - - x
 5   ROLAND GIBSON, et al.       :
 6           Plaintiffs,         :
 7   v.                          :  Civil Action No: 06-0551
 8   DISTRICT OF COLUMBIA, et al :
 9           Defendants          :
10   - - - - - - - - - - - - - x
11                                   Washington, D.C.
12                                   Thursday, January 25, 2007
13
14
15
16   Whereupon,
17                        MARVIN WATKINS
18   the Witness, called for examination by Counsel for the
19   Defendants, pursuant to notice and agreement of counsel as to
20   time and place, at 501 3rd Street, NW, Washington, D.C., where
21   were present on behalf of the parties:
22
23
24
25
```

1    Q    Okay.  And so then what happens?

2    A    I entered the intersection.  There's a -- we had a -
3  - actually there was Park Police there --

4    Q    And that, you know, that's the important part of
5  today so --

6    A    Right.

7    Q    -- I would like to go --

8         MS. JOHNSON:  Guys, excuse me.

9         UNIDENTIFIED SPEAKER:  Sorry.

10        MS. JOHNSON:  Could you guys keep it down a little?
11  Thank you.

12        BY MS. JOHNSON:

13   Q    So you came to a complete stop at 61st Street at
14  that stop sign?

15   A    Yes, ma'am.

16   Q    And where were you intending to go next?

17   A    I was intending to go to the left.

18   Q    Why were you making a left?

19   A    Because that's -- I don't remember -- what I do
20  remember, that's where I believe the Park Police had the bail
21  out and when we were on 61st Street, before we got to the stop
22  sign, they had a bail out and I do remember there was a
23  transmission across the radio, shots fired, so it was, it was
24  time to go.

25   Q    Time to go, what does that mean?

```
 1    Q    How did you know to make a left on Clay Street?
 2    A    That's the best of my knowledge.  You're talking
 3  about over two years ago.  But at that time, that's -- I don't
 4  remember where they were, ma'am.  Not now.
 5    Q    Okay.  But the -- I mean, you would have been -- you
 6  were still assisting Park police at the time you were making
 7  that left turn --
 8    A    Yes, ma'am.
 9    Q    -- on Clay Street?  Okay.  You still had your
10  emergency lights and siren activated?
11    A    Yes, ma'am.
12    Q    Okay.  And so, after you left the hospital, do you
13  remember where you went next?  Did you go back to the scene?
14    A    No, ma'am, no.
15    Q    Did you go to the Sixth District precinct?
16    A    I don't recall where I went, ma'am.  I don't know.
17    Q    Okay.  And there came a time after this accident
18  occurred when you completed an accident report?
19    A    Yes, ma'am.
20    Q    Do you remember when you completed that report?
21    A    I didn't, I didn't do the report, ma'am.
22    Q    You didn't?
23    A    No.
24    Q    Did you sign the report?
25    A    I can't sign if it I didn't do it.
```

1   A   No, ma'am.

2   Q   Do you know when you saw the vehicle in that split
3   second before your cars collided whether or not it had its
4   sirens activated?

5   A   Mine was on. I didn't hear any other sirens from
6   other vehicles and we had both our windows open. I didn't
7   hear anything.

8   Q   Okay. Did you see any sirens?

9   A   No, ma'am.

10  Q   Okay. And based on what you know of the accident,
11  are you able to say how that car was damaged on the --

12  A   Right side.

13  Q   -- driver's side?

14  A   Yes, ma'am. The driver's side door was hit.

15  Q   Do you know how that could have happened based on
16  your knowledge of the scene of what happened?

17  A   Again, I'm not an expert on recreating crashes but
18  his vehicle got struck by -- his driver's side door is
19  obviously damaged. Again, I'm not an expert on, on recreating
20  crashes.

21  Q   But I just -- okay.

22  A   It's possible that, from this way it looks that my
23  car went into his.

24  Q   Right. Is that possible?

25  A   Yes, ma'am, it's very possible.

98

```
 1                  AFTERNOON   SESSION
 2                                              (1:41 p.m.)
 3         COURT REPORTER:  Back on the record, 1:41.
 4         BY MS. JOHNSON:
 5     Q   Okay.  Officer Watkins, prior to the lunch break we
 6  were talking about the, the accident that occurred on December
 7  8th, 2004, and we were discussing the loss of property report
 8  that you had, that you had completed.  To your knowledge was
 9  an accident report, a PD-10, completed?
10     A   Yes, ma'am.
11     Q   And do you know who completed that?
12     A   I believe my supervisor, Sergeant Wade.
13     Q   Now on the day of the incident, was Sergeant -- was
14  your supervisor Wade at any time broadcasting over the
15  dispatch radio?
16     A   Yes, ma'am.
17     Q   Do you recall any communications you heard from
18  supervisor Wade on the day of the dispatch?  I'm sorry, on the
19  day of the incident, December 8th, 2004?
20     A   She had asked the dispatcher what was going on with
21  Park Police, what was the call from Park Police.  Also, units
22  not to get involved in the chase but assist the Park Police
23  officers.
24     Q   She specifically said to assist the Park Police?
25     A   She said that MPD officers can assist -- I don't
```

```
 1    A    I don't remember if there were any cars there.
 2    Q    Okay.  What did you notice when you came to the
 3 intersection before -- when you came to the intersection, what
 4 did you look at and what did you see?
 5    A    I looked -- I mean, I knew there was a
 6 four-way stop there.  I looked to the right to see if anything
 7 was coming before I got to the stop sign.  I don't -- I didn't
 8 see any vehicles coming down Clay.
 9    Q    Okay.
10    A    When I got to the stop sign I proceeded to go out
11 and within a split second there was an accident.
12    Q    How far did you look to the right?  That is, how far
13 could you see because we said there was -- you said there was
14 nothing visibly obstructing your view to the right or going
15 down Clay Street --
16    A    Right.
17    Q    -- to your right.  How far could you see?
18    A    To the best of my knowledge, you can see a pretty
19 good ways down Clay and I'm trying to recall that now.  To the
20 best of my knowledge it's nothing blocking so I, I looked down
21 Clay Street to make sure that when I made my left turn, the
22 intersection was going to be clear.
23    Q    So you could almost see down to 60th Street?
24    A    I believe so, sir.  I can't -- again, I don't have
25 the map right in front of me and I don't want to give a false
```

```
 1  daily basis?
 2      A    I do, sir, but in this incident, this is not a
 3  hearing or perception.
 4      Q    What is it then?
 5      A    Factual information, sir.  I can't give you a
 6  speculative answer.  Now, I can -- I could tell you what -- I
 7  can sit here and say what I, what I think.
 8      Q    Yeah, that's what I want you to tell me.
 9      A    Okay.  Do I believe this individual was driving at a
10  high rate of speed?  I do.
11      Q    Okay.  And what rate of speed were you going, if you
12  know?
13      A    I don't know, sir.  When I entered that
14  intersection, I couldn't tell you.
15      Q    Okay.  Can you estimate for me what you think you
16  were going?
17      A    No, sir.
18      Q    Okay.  You noticed there no skid marks on  your
19  vehicle.  Fair?  From all the records that you reviewed in --
20      A    There were none.
21      Q    -- preparation for today.
22      A    There were none.
23      Q    And there was no skid marks on the Park Police
24  vehicle?
25      A    That's correct.
```