# EXHIBIT C

Case 1:06-cv-00551-JMF     Document 44-5     Filed 06/28/2007     Page 1 of 9

## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLUMBIA
 3
 4  - - - - - - - - - - - - - - x
 5  ROLAND GIBSON, et al.        :
 6          Plaintiffs,          :
 7  v.                           : Civil Action No: 06-0551
 8  DISTRICT OF COLUMBIA, et al  :
 9          Defendants           :
10  - - - -        - - - - - - - x
11                      Washington, D.C.
12                      Thursday, January 25, 2007
13
14
15
16  Whereupon,
17                   MARVIN WATKINS
18  the Witness, called for examination by Counsel for the
19  Defendants, pursuant to notice and agreement of counsel as to
20  time and place, at 501 3rd Street, NW, Washington, D.C., where
21  were present on behalf of the parties:
22
23
24
25
```

## Page 2

```
 1  APPEARANCES:
 2          On Behalf of the United States:
 3              MICHELLE JOHNSON
 4              501 3rd Street, NW
 5              Washington, DC
 6              202-305-9971
 7
 8          On Behalf of the District of Columbia:
 9              JAMES H. VRICOS, Esquire
10              Office of the Attorney General
11              Civil Litigation Division
12              441 4th Street, NW
13              Sixth Floor South
14              Washington, DC 20001
15              202-724-6600
16
17          On Behalf of the Plaintiffs:
18              JOEL DuBoff, Esquire
19              8401 Colesville Road
20              Suite 501
21              Silver Spring, Maryland 20910
22
23
24
25
```

## Page 3

```
 1  Also present:
 2              PERRI S. ROTHEMICH, Esquire
 3              U.S. Department of the Interior
 4              Office of the Solicitor
 5              1849 C Street, NW
 6              Washington, DC 20240
 7
 8              PETER A. GENTILE
 9              Investigator-Claims Specialist
10              National Park Service
11              National Capitol Region
12              United States Park Police
13              1100 Ohio Drive, SW
14              Washington, DC 20024
15
16              PETER SMITH, Esquire
17
```

## Page 4

```
 1                    I N D E X
 2  WITNESS:            EXAMINATION:           PAGE:
 3  Marvin Watkins      Ms. Johnson - Direct     5
 4                      Mr. DuBoff - Cross     138
 5                      Ms. Johnson - Redirect 167
 6                      Mr. Vricos - Cross     169
 7                      Ms. Johnson - Redirect 172
 8
 9                    E X H I B I T S
10  EXHIBIT NO.:        DESCRIPTION:           PAGE:
11      1           First Set of Interrogatories  38
12      2           General Orders                42
13      3           MPD Report of Damage To or Loss 87
14      4           Photograph                    97
15      5           Photograph                   100
16      6           DC Vehicle Accident Report   172
```

Page 17

1  Well, first, let me back up. Were you guys involved in a
2  pursuit, a vehicular pursuit at that time, when he lost
3  control?
4      A   No, ma'am.
5      Q   Was he speeding?
6      A   I don't recall. I don't recall what his driving was
7  because that was quite a while ago also.
8      Q   Do you remember what happened as result of this
9  accident?
10     A   We got stuck between a wall and a pole.
11     Q   And was there an investigation conducted into that
12 accident?
13     A   I believe so, ma'am, but I don't know the, I don't
14 know the -- of the investigation. I wasn't driving; I was the
15 passenger.
16     Q   Right. Did you have to give a written statement at
17 the time that the accident occurred?
18     A   I don't remember, not on that.
19     Q   Okay. So let's go now to about December 7th, 2004,
20 and I'm going to represent from the records I've reviewed, it
21 appears that on December 8th, 2004, the date of the accident,
22 you were working a tour of duty from 7 a.m. until 3:30 p.m.?
23     A   Yes, ma'am.
24     Q   Were you working that same tour of duty on December
25 7th?

Page 18

1      A   Yes, ma'am.
2      Q   And what did your -- what area were you responsible
3  for touring?
4      A   I was responsible for, it's PSA 604. It's on the
5  south, southeast side of 16th.
6      Q   I'm sorry, could you repeat that? PD6 you said?
7      A   PSA, patrol service area.
8      Q   Okay.
9      A   604, which is on the south side of the Sixth
10 District, southeast side, ma'am.
11     Q   So the precinct that you belong -- is there a
12 precinct --
13     A   Yes.
14     Q   -- that you belong to that's the Sixth District?
15     A   Sixth District.
16     Q   Okay. And that's the southeast side of Washington?
17     A   My patrolling service area was on the southeast side
18 of the Sixth District.
19     Q   Okay. Roughly how much area does that encompass?
20 Like DC blocks, would you -- is that just a really large,
21 large area or if you could give any kind of boundaries.
22     A   Okay. Okay. You start at -- 7, travelling
23 southbound, so it was Benning Road, go up to Bolling Road and
24 there, make a right on Ridge Road, turn on D Street -- no,
25 turn on G rather. It's a pretty good sized area.

Page 19

1      Q   Okay.
2      A   I mean, when you get to -- you go back down to Texas
3  Avenue and it loops right around, back around to -- Texas runs
4  right back into East Capitol and it's a pretty good sized
5  area.
6      Q   Okay. I know because I take East Capitol into DC
7  every morning --
8      A   Yes, ma'am.
9      Q   -- when I drive. There's a lot traffic over there
10 on most mornings.
11     A   A lot.
12     Q   Yeah. And when you're on your tour of duty, are you
13 basically circling this large area repeatedly from 7 a.m. to
14 3:30?
15     A   Well, after a while, you know, certain areas,
16 certain areas nobody's doing anything. After a while
17 -- I work midnights now so you pretty much focus on your hot
18 spots, but at that particular time, that's, that's how you,
19 you know, during the daytime it's not as busy as midnight, not
20 in that aspect.
21     Q   Right. Not in the criminal activity aspects?
22     A   That's correct.
23     Q   Okay. So on December 7th, 2004, you were working
24 that 7 a.m. to 3:30 p.m. shift?
25     A   Yes, ma'am.

Page 20

1      Q   And you got off at 3:30. Is it typical -- do you
2  typically get off at 3:30 at the end of the day?
3      A   Pretty much. If there's -- if nothing -- if you're
4  not held over or nothing else is going on or if you're not
5  processing an arrest about that time, then pretty much if they
6  can get you off at the time they will.
7      Q   Okay. What if you get a call or you hear something
8  on dispatch at 3:30, are you going to respond to that or are
9  you doing to say, I'm about to go home guys so I'll let other
10 units respond?
11     A   Well, if there's -- if they have units in service,
12 the dispatch will send the next, the next shift in service.
13 But if there's no one in service you take that call.
14     Q   And do you recall the day prior to this accident
15 whether there was anything memorable that happened on December
16 7th while you were on your tour of duty, any arrest, any car
17 chase, vehicular pursuits?
18     A   No, ma'am, I don't remember.
19     Q   Okay. Do you remember if you left work on December
20 7th at 3:30?
21     A   No, ma'am, I don't remember that either.
22     Q   Is it, is it normally the case that you, would leave
23 work at 3:30, or was it normally the case you'd end up, you
24 know, leaving work a little later?
25     A   The official is trying to get you off on time, but

Page 29

1   A   No, ma'am, I can't.
2   Q   Yeah. I'm assuming you don't remember all of that.
3   A   Not, not from -- no, that, that's a little
4   difficult.
5   Q   You remember the accident occurring?
6   A   Oh, clearly.
7   Q   Yes.
8   A   Yes, ma'am.
9   Q   So nothing out of the extraordinary other than this
10  incident?
11  A   No, ma'am. It was a pretty quiet day from my
12  recollection.
13  Q   Okay. And so how is it that you came to be engaged
14  in a vehicular pursuit on December 8th, 2004?
15  A   Officer Gulich and myself, I don't remember where we
16  first were. I believe we were on, you know, Texas Avenue --
17  Park Police officers pursuing one into the Sixth District and
18  --
19  Q   Pursuing, I'm sorry, what?
20  A   Pursuing one.
21  Q   Pursuing a suspect?
22  A   Yes, ma'am.
23  Q   Do you remember what kind of car the suspect was in?
24  A   It was a black Jeep Cherokee and Officer Gulich, I
25  believe he called the dispatcher and asked her to check and

Page 30

1   see if they had -- what they had going on and the dispatcher
2   advised -- I don't remember the exact statement that she made.
3   Q   Now, is that -- let me just -- I'll probably be
4   interrupting you as you go through, just --
5   A   Sure.
6   Q   -- because I need to clarify some things. I know
7   you typically, you monitor the dispatcher channel. Is it
8   normal to call into the dispatcher?
9   A   Well, if the dispatcher calls you, you have to
10  respond. If something is going on, if you have a priority, if
11  you have a priority situation, say shots fired, it is your
12  responsibility as a police officer to notify the dispatcher so
13  she can either send more units or find out what's going on and
14  if another agency has something going on in the, in the
15  district, they have the ability to find out what's going on.
16  Q   Now, had she made some sort of announcement that
17  prompted Officer Gulich to call into her?
18  A   To the best of my recollection he called her first.
19  I don't remember exactly.
20  Q   But do you know why he did that? Did he say I'm
21  calling because we just saw these Park Police vehicles and I
22  want to know what's going on?
23  A   Yes, ma'am. I mean, because if they're in, in the
24  District sometimes they might need our assistance. Just like
25  if we're in, in another county, if we have a critical exigent

Page 31

1   situation, we might need another agency's help. We're all
2   police officers so we have to help each other.
3   Q   So is that -- in your experience is it common to
4   assist other law enforcement agencies if they are pursuing a
5   suspect in the District of Columbia?
6   A   Again, that depends. If you have the authorization
7   to, then yes. No, don't get in it.
8   Q   And who gives you the authorization?
9   A   Bottom line would be your watch commander, whether
10  they decide whether you stay in or get in.
11  Q   Do you remember who your watch commander was on
12  December 8th, 2004?
13  A   I do not.
14  Q   And the watch commander would, similar to the field
15  supervisor, have to make any announcements through the
16  dispatcher to you?
17  A   Affirm, ma'am. Yes, ma'am.
18  Q   That's yes, okay.
19  A   Yes, ma'am.
20  Q   You can talk like a civilian today.
21  A   Sorry.
22  Q   I know. Okay. So you said you, you're near Texas
23  Avenue and you saw the Park Police pursuing a black Jeep
24  Cherokee. Do you remember around what time that was?
25  A   I believe it was around 1500 hours. I don't know

Page 32

1   exactly what time. I do know it was close to what we talk
2   about a check off so --
3   Q   Right. So you're like, man.
4   A   No, it didn't bother me at all.
5   Q   Okay. All right. So Officer, Officer Gulich called
6   the dispatcher and told him he had seen the Park Police
7   pursuing a suspect, and do you recall -- let me ask you this.
8   Is Officer Gulich making this call to the dispatcher so that
9   it's audible to you what she's saying and what he's saying?
10  A   Yes, ma'am. We have, you have a radio on your
11  person, a radio on his person and a radio in the car.
12  Q   Okay. And do you recall what the dispatcher said to
13  --
14  A   No, ma'am.
15  Q   Okay.
16  A   I'm sorry. No, ma'am.
17  Q   Okay. You said that there's a watch commander. Is
18  he -- is the watch commander during your tour of duty
19  generally out on a separate tour of duty or is he back at the
20  precinct at the Sixth District?
21  A   There -- every duty has a watch commander. They
22  have three duties. Each one has his own watch commander.
23  They can be in the station. They can be on the street. They
24  can be assisting, taking runs. They can be anywhere.
25  Q   Do you know what the car number was for your watch

Page 45

1 referred to as a code 1?
2    A   Yes, ma'am.
3    Q   Do you need authorization to engage in a
4 code 1?
5    A   You do.
6    Q   So who did you get your authorization from?
7    A   That does come from your dispatcher.
8    Q   And so the dispatcher gave you the code 1
9 authorization?
10   A   She did, ma'am, I believe so. I don't exactly
11 remember the time.
12   Q   Okay. All right. So get back to our story, you
13 were -- you saw the Park Police. You called the dispatcher,
14 some words were said. You turn on your lights and sirens and
15 then what happens?
16   A   When we get around 61st and Banks, around near Watts
17 Park, we were canvassing the area for the suspects and --
18   Q   I'm sorry, 61st and Banks?
19   A   Northeast, yes, ma'am.
20   Q   Okay. And your lights and sirens are on this entire
21 time?
22   A   Yes, ma'am.
23   Q   And do you remember what your rate of speed was?
24   A   No, ma'am.
25   Q   Were you going fast? Were you going slow?

Page 46

1    A   When we were there we, we were going slow. We were
2 canvassing. We weren't -- because we were looking around in
3 the area. I don't know what my speed was, ma'am, but by
4 General Orders we're required not to go anymore than two miles
5 over the posted speed limit which is 25 miles an hour.
6    Q   Okay. So you were canvassing the area at 61st and
7 Banks and you're going --
8    A   We were going slow.
9    Q   Going slowly.
10   A   Yes, ma'am.
11   Q   Okay. And then what happens?
12   A   We had -- we -- a transfer comes over the radio that
13 there was a bail out. We were responding to assist with the
14 bail out and when we got to Clay Street, that's when the
15 accident occurred.
16   Q   Okay. Where was the -- did the transmission
17 indicate where the bail out occurred?
18   A   I don't remember. All I know is that Clay, if you
19 come up from Banks, 61st and Banks to 61st and Clay and make a
20 left, I believe there's a field or an open area. I don't
21 exactly remember where it was, ma'am, but that's where --
22 that's the direction that we were intending to go.
23   Q   Now, on 61st Street, I know if you go straight down
24 61st you, you come to an area where you can make a right to
25 get onto East Capitol and there was like an open field right

Page 47

1 there before East Capitol Street.
2    A   Uh-huh.
3    Q   Is that accurate? Do you recall it that way?
4    A   Yes, ma'am.
5    Q   Okay. And so a block prior, on 61st and Clay,
6 there's actually -- it's a residential area where there are
7 low sitting -- they're not houses but they're like apartment
8 buildings.
9    A   Yes, ma'am.
10   Q   Like two level story apartment buildings, and so you
11 came to the corner of 61st and Clay Street. You're on the
12 right side of that stop sign right there at the right. You're
13 going -- because you're going --
14   A   Coming from Banks.
15   Q   Coming from Banks. Past the liquor store that's
16 like --
17      MR. VRICOS: I'm going to object to the compound
18 nature of the question and ask --
19      MS. JOHNSON: That's fine.
20      MR. VRICOS: -- for you to break it up a little bit.
21      MS. JOHNSON: Sure.
22      BY MS. JOHNSON:
23   Q   You're coming from Banks Street. Is Banks before or
24 after the liquor store that's like on 61st Street, do you
25 know? You may not remember.

Page 48

1    A   I don't know.
2    Q   Okay.
3    A   I don't recall a liquor store. I'm looking right
4 now -- don't see a liquor store.
5    Q   Okay. So you come to the intersection of 61st --
6      (Pause.)
7      BY MS. JOHNSON:
8    Q   You come into the corner of 61st and Clay Street.
9 Yes?
10   A   Yes, ma'am.
11   Q   And is that area within your patrol security area?
12   A   No, ma'am.
13   Q   Did you have to get authorization to go outside of
14 your patrol security area?
15   A   If the dispatcher gives you the authority to go, you
16 can go.
17   Q   Did she give you authority to go there?
18   A   When my training officer stated that we were going
19 to get in the area to assist she gave us the authority. She
20 gave us the right to go.
21   Q   All right. So take me step by step. What happens
22 when you come to that stop sign at 61st and Clay Street, and
23 before you do, can you tell me whether or not the stop sign
24 was on your right or your left hand side?
25   A   The stop sign was on my right hand side. It was a

Page 49

1 four-way stop.
2  Q  Okay. And so, what happened next? What happens
3 when you come to that stop sign?
4  A  Come to the stop sign and we stop -- the
5 intersection.
6     MR. DuBOFF: I'm sorry, I couldn't hear you. Could
7 you repeat that please?
8     THE WITNESS: When we got to the stop sign, we
9 stopped and cleared the intersection.
10    MR. DuBOFF: You stopped --
11    THE WITNESS: To clear --
12    MR. DuBOFF: Okay.
13    THE WITNESS: -- the intersection.
14    BY MS. JOHNSON:
15  Q  And what does that mean, to clear the intersection?
16  A  Make sure there's nothing coming by.
17  Q  And to do that, did you have to pull up past the
18 stop sign into the crosswalk so that you could see down the
19 street?
20  A  No, ma'am. There's -- it's a clear view. You
21 should be able to see. There's nothing stopping you from
22 seeing if cars are coming.
23  Q  Okay. Were there cars parked in the street on Clay
24 Street to your right?
25  A  That's a -- there's a residential building right

Page 50

1 there. I don't, I don't recall any vehicles sitting there.
2 There were some further down past those apartments.
3  Q  Okay.
4  A  To the best of my knowledge.
5  Q  Do you remember if there was a fence or anything by
6 that stop sign, anything that might obstruct your view?
7  A  I don't remember, ma'am. I don't believe so.
8  Q  Okay. And so you came to a complete stop at the
9 stop sign?
10  A  Yes, ma'am.
11  Q  And you looked to your right and to your left, up
12 and down Clay Street?
13  A  Yes, ma'am, to the best that I could, yes, ma'am. I
14 cleared the intersection, made sure there was nothing coming
15 before I proceeded.
16  Q  Okay. And did you see anything at that time?
17  A  No, ma'am, I did not.
18  Q  Did you see anything directly in front of you?
19  A  I did see some vehicles up on 61st Street. I don't,
20 I don't remember how many there were.
21  Q  Did you see a vehicle stopped at any of the stop
22 signs at this four-way intersection?
23  A  I don't recall.
24  Q  Okay. And so then what happens?
25  A  I entered the intersection. There's a -- we had a -

Page 51

1 - actually there was Park Police there --
2  Q  And that, you know, that's the important part of
3 today so --
4  A  Right.
5  Q  -- I would like to go --
6     MS. JOHNSON: Guys, excuse me.
7     UNIDENTIFIED SPEAKER: Sorry.
8     MS. JOHNSON: Could you guys keep it down a little?
9 Thank you.
10    BY MS. JOHNSON:
11  Q  So you came to a complete stop at 61st Street at
12 that stop sign?
13  A  Yes, ma'am.
14  Q  And where were you intending to go next?
15  A  I was intending to go to the left.
16  Q  Why were you making a left?
17  A  Because that's -- I don't remember -- what I do
18 remember, that's where I believe the Park Police had the bail
19 out and when we were on 61st Street, before we got to the stop
20 sign, they had a bail out and I do remember there was a
21 transmission across the radio, shots fired, so it was, it was
22 time to go.
23  Q  Time to go, what does that mean?
24  A  Where we need to help at.
25  Q  Need to help out?

Page 52

1  A  Yes, ma'am.
2  Q  Did your dispatcher tell you that?
3  A  It was broadcast across the radio.
4  Q  Okay. And do you remember what the broadcast said?
5  A  Not exactly word for word, no.
6  Q  Do you remember what the general gist of the
7 broadcast was?
8  A  Shots fired.
9  Q  And that was it? That's all that you remember?
10  A  Yes, ma'am.
11  Q  Okay. And so shots fired, is that like an emergency
12 situation?
13  A  Yes, ma'am, because -- not, I'm not saying that -- I
14 have to say this carefully. I'm not saying that people that
15 are not in uniform don't matter but you have officers out
16 there now.
17  Q  Yeah.
18  A  It's time to assist. Even with civilians, you have
19 to assist. You don't want anybody dying but we had to get out
20 there.
21  Q  Yeah. So you really needed to get out there. Were
22 you still observing the speed limit at that time when the
23 shots fired was made?
24  A  To the best of my knowledge, ma'am. I don't know --
25 you know, again, we're required by General Order, even code 1,

Page 53

1 which is lights and siren, it's 10 miles over the speed limit,
2 but I can't sit here before you and say exactly how fast I was
3 going. We weren't travelling without regard to the safety and
4 vehicular safety.
5  Q  Uh-huh. And despite the fact that shots fired had
6 been broadcasted over the dispatch, you still came to the stop
7 sign and completely stopped?
8  A  Yes, ma'am.
9  Q  And you don't recall seeing any cars when you came
10 to that stop sign to the left of the stop sign, so on Clay
11 towards the left?
12  A  I don't recall seeing any.
13  Q  Okay.
14  A  I do know that where his vehicle was, I don't
15 believe there were any vehicles along that line where his
16 vehicle ended up.
17  Q  Okay. And do you remember if there were other --
18 was there traffic in the area? I know it's a residential
19 area. Were there other cars coming through the intersection?
20  A  I didn't see any, ma'am.
21  Q  You didn't see any, okay. What was the weather like
22 on that day, do you remember?
23  A  It was clear.
24  Q  Clear day, okay. And at this time, when you're at
25 61st and Clay Street, are you aware of how many other MPD

Page 54

1 vehicles were participating in assisting Park Police?
2  A  No.
3  Q  Do you know if a number 1 or a number 2 vehicle from
4 MPD had been designated to assist in the Park Police?
5  A  I believe we were there, 604-1, if I, if I'm
6 correct. You know, I had stated that before.
7  Q  You were the what?
8  A  We were there -- we were the primary car. We were
9 604-1.
10  Q  You were the primary car to assist in the Park
11 Police?
12  A  We were a primary car. I don't -- my partner came
13 in contact with them first so to the best of my knowledge we
14 were the first MPD vehicle to assist them, assist Park Police.
15  Q  How would you have gotten that knowledge? Through
16 the dispatch?
17  A  Yes, ma'am.
18  Q  Can MPD vehicles transmit to one another as well on
19 channel 6?
20  A  We have, we have means of talking to each other,
21 yes, ma'am.
22  Q  Okay. So again, we're at, still at the stop sign at
23 61st and Clay, and you're on 61st and you're about to make a
24 left onto Clay Street. Is that accurate?
25  A  Yes, ma'am.

Page 55

1  Q  Okay. So then walk me through what happens next.
2  A  Well, when we entered the intersection, the Park
3 Police officer and my -- both of our cruisers collided. Mine
4 spun around, came to a -- did a 180 degree and came to a
5 complete stop. The Park Police officer's vehicle kept through
6 -- went through the intersection and up on some steps next to
7 a utility pole.
8  Q  Okay. Now, you say the cruisers collided. You're
9 making a left hand turn onto Clay Street. Do you remember
10 where the Park Police vehicle was coming from?
11  A  I was on 61st and I, I believe he was on Clay.
12  Q  Okay.
13  A  Because of the way he was coming across and I was --
14 our vehicles met like that.
15   MR. DuBOFF: I'm sorry, met like what?
16   THE WITNESS: Met --
17   MS. JOHNSON: Yeah, you can't --
18   THE WITNESS: I'm sorry. Our vehicles, he was
19 traveling Clay Street to -- our vehicles were traveling
20 perpendicular to each other if that's, if that's better, and
21 they, they hit at a 90 degree angle. They -- I don't know how
22 to describe that. Our front fender -- our front quarter
23 panels met. And does that help, sir?
24   BY MS. JOHNSON:
25  Q  Your front quarter panels?

Page 56

1  A  Yes.
2  Q  Because you're making a left -- I may not use my
3 hands either. You were making a left turn and he was coming
4 straight, and so he would have hit you on the front --
5  A  Right.
6  Q  -- right passenger side --
7  A  Right.
8  Q  -- of your vehicle on the right side?
9  A  Yes, ma'am.
10  Q  Okay. And you said your car did 180 degree turn.
11  A  Yes, ma'am.
12  Q  Did you hit any other objects?
13  A  There was a -- apparently there was a vehicle that
14 was stopped at the stop sign on the other side. Our vehicles
15 are -- when mine, my vehicle, the rear of my vehicle struck
16 his.
17  Q  The rear of your vehicle?
18  A  Struck the front of the vehicle on the other side of
19 the stop sign.
20  Q  Okay.
21   MR. DuBOFF: A civilian vehicle?
22   THE WITNESS: Yes, sir.
23   BY MS. JOHNSON:
24  Q  All right. And then what happened?
25  A  The ambulance was called and I was taken to the --

Page 73

1  A  This is -- if there's a crime committed in the
2  District that is a felony.
3  Q  Okay. But this says if it's not a felony you an
4  assist.
5  A  Again, this is the lowest form of assistance right
6  here. Morally and legally we cannot just sit by and do
7  nothing.
8  Q  But where does it say that in this General Order?
9  Because what you've pointed to says that where you respond to
10 a scene to assist an officer from an outside jurisdiction at
11 the end of a pursuit and discover the crime was not a felony
12 you can assist by initiating contact or conducting a stop and
13 frisk or you can arrest the suspect, but it doesn't say -- it
14 does not say that you can assist if it is a felony and it does
15 not say that you can assist before the end of a pursuit.
16 A  At this time I don't have that answer.
17 Q  Okay.
18 A  But we did have authorization through our dispatch.
19 Q  Okay. Is there anything in another General Order
20 that would discuss exigent circumstances?
21 A  You have numerous ones that I do not have the
22 numbers to right off, right off the top of my head that
23 discuss exigent circumstances is an emergency situation.
24 Q  Okay. And the authorization that you said that you
25 got from dispatch, that would be on that audiotape because all

Page 74

1  audio transmissions are recorded, correct?
2  A  Should be, yes, ma'am.
3  Q  Well, is there any reason it wouldn't be?
4  A  No, ma'am.
5  Q  Okay. Do you recall any specific training you
6  received regarding exigent circumstances?
7  A  You learn, you learn about exigent circumstances in,
8  in your driving, driving part of your academy, your vehicular
9  part of your academy, operating departmental vehicles rather,
10 and your use of force.
11 Q  Do you recall anything in particular regarding what
12 you learned about exigent circumstances in the academy?
13 A  You learn pretty much how to conduct yourself on an
14 exigent circumstance and that's the most important part.
15 Q  And so when you're assisting in a vehicular pursuit,
16 is that considered an exigent circumstance by itself, just the
17 fact that there's a vehicular pursuit from another
18 jurisdiction that comes into the District of Columbia?
19     MR VRICOS  Again, I'm going to object to the
20 characterization of him assisting in a vehicular pursuit. He
21 said that he assisted. He said that he did not participate in
22 the pursuit.
23     BY MS. JOHNSON:
24 Q  What were you assisting in on December 8, 2004?
25 A  Subjects were armed.

Page 75

1  Q  Subjects were armed?
2  A  Yes, ma'am.
3  Q  They were in a car, yes or no?
4  A  They were, ma'am.
5  Q  So how were you responding?
6  A  We were getting in the area where Park Police had
7  pursued the vehicle in the case of a bail out which is jumping
8  out of the vehicle.
9  Q  Okay. And so, you were, you were assisting, you
10 were assisting Park Police in attempting to apprehend a
11 suspect that was armed. Is that what you're testifying to?
12 A  We were assisting them. This is a case the subjects
13 bailed out the vehicle. That was the -- that's pretty much
14 the extent of our duties, if the subject has bailed out and
15 they had a foot chase or they needed a canvas.
16 Q  Okay. So let me just get this straight. When you
17 come to 61st and Clay Street, do you know where the suspect
18 vehicle was?
19 A  We believe they were -- I don't remember the actual
20 number of the street but there's a field. It's an open field.
21 I don't know the address of that open field.
22 Q  Okay. All right. So at the conclusion, you went to
23 the hospital. That's correct?
24 A  Yes, ma'am.
25 Q  And what was your diagnosis? Did they diagnose you

Page 76

1  with any injuries?
2  A  They asked -- I was asked and I don't remember.
3  Actually, I had to -- right there I had
4  x-rays of my, my neck and back and then I had to go to our
5  police and fire clinic after that.
6  Q  Okay. Now, something I still -- I just want to
7  understand this. What's the difference between assisting in a
8  -- well, I guess the way you phrased it is you were assisting
9  Park Police. What's the difference between assisting and
10 participating in a vehicular pursuit?
11 A  You have to have authorization to be -- to
12 participate in a vehicle pursuit. You have to have clear
13 authorization. If, if I'm getting in the area for a canvas,
14 or in this case of a bail out, that's exactly what I'm doing.
15 I'm not chasing this car.
16 Q  Okay. And you're authorized to drive code 1 when
17 you're assisting?
18 A  If it's an emergency situation, yes, ma'am.
19 Q  You don't need authorization to drive code 1?
20 A  If it's an emergency situation, yes, ma'am.
21 Q  So you do need authorization to drive code 1 in an
22 emergency situation?
23 A  You do, ma'am. That's what I just said.
24 Q  Okay. And you got that from your dispatcher you're
25 saying?

### Page 77

1  A  Yes, ma'am.
2  Q  Okay.
3      MR. DUBOFF: And code 1 means lights and sirens,
4  both?
5      THE WITNESS: It does, sir.
6      BY MS. JOHNSON:
7  Q  So also, the authorization you received to drive
8  code 1, that would be on that audiotape of the transmissions
9  from that day?
10 A  It should be, ma'am.
11 Q  Okay. And when you saw Park policemen, you and
12 Officer Gulich first saw the Park police, you testified that
13 you were by Texas Avenue and did you follow the Park Police or
14 did you go another way? Did you go the same way that Park --
15 that you saw Park Police going or did you go another way?
16 A  When we were getting in the area for the assist,
17 there's only one way to that area to begin with and we went
18 another way from then. You have to go to Texas Avenue. It's
19 a one -- there's no other way to go.
20 Q  Were they going down Texas Avenue? Like which way,
21 northbound, southbound, do you know?
22 A  I believe they were going northbound. I don't
23 exactly remember, ma'am. It's been a long time.
24 Q  And so, you did not follow the Park Police when you
25 saw them. Did you continue to go -- were you also on Texas

### Page 78

1  Avenue at the time you saw them?
2  A  I believe that's where we were, ma'am.
3  Q  And do you recall which direction you went in after
4  you saw the Park Police?
5  A  Again, there's only one way to go. You can either
6  go -- you have to go -- you have to get off Texas Avenue, by
7  Texas Avenue in the direction of where the vehicle was
8  supposed to have been headed. If you didn't, you would --
9  there's no sense even responding to an assist because you're
10 going away from the, the area.
11 Q  And at the time that you, you saw the Park police
12 and Officer Gulich made that call to dispatch, is that when
13 the dispatcher told you that the suspect was armed?
14 A  I believe so, ma'am.
15 Q  And that would be on that tape as well, correct?
16 A  Should be.
17 Q  Okay. And the fact that the suspect was armed was
18 an exigent circumstance?
19 A  Affirm, yes, ma'am.
20 Q  Okay. So after you went -- so you said you were
21 going the other way from Park police because you were going to
22 go in the area where the suspect was fleeing? Is that
23 accurate?
24 A  Yes, ma'am.
25 Q  So which way did you go? Can you kind of tell me?

### Page 79

1  A  No, ma'am. That's too far for me to retrace my
2  steps.
3  Q  Okay. But you no longer saw the Park police. When
4  you, when you started to go whatever way you went, you never -
5  - you no longer saw Park police?
6  A  No. I don't, I don't remember where exactly it was
7  where I didn't see them anymore, but all I know is we didn't
8  follow them step for step.
9  Q  Okay. And you were monitoring the channel 6
10 dispatch the entire time during the -- during the time you
11 were assisting the Park police?
12 A  Yes, ma'am. That's the channel that we monitor.
13 Q  And so, was there a time that you can recall that
14 you can pinpoint when the dispatch said the suspects were in a
15 certain area?
16 A  No.
17 Q  Okay. So when you came to that stop sign at 61st
18 and Clay, you had said that you had received notification from
19 dispatch that the suspects had bailed?
20 A  We were sitting before the stop sign. We were
21 driving slow in that area on 61st Street, and then we, we
22 heard bail out and then shots fired and we were responding, so
23 I don't remember where the officers were but we were
24 responding to there and that's the best I can give you.
25 Q  How did you know to make a left on Clay Street?

### Page 80

1  A  That's the best of my knowledge. You're talking
2  about over two years ago. But at that time, that's -- I don't
3  remember where they were, ma'am. Not now.
4  Q  Okay. But the -- I mean, you would have been -- you
5  were still assisting Park police at the time you were making
6  that left turn --
7  A  Yes, ma'am.
8  Q  -- on Clay Street? Okay. You still had your
9  emergency lights and siren activated?
10 A  Yes, ma'am.
11 Q  Okay. And so, after you left the hospital, do you
12 remember where you went next? Did you go back to the scene?
13 A  No, ma'am, no.
14 Q  Did you go to the Sixth District precinct?
15 A  I don't recall where I went, ma'am. I don't know.
16 Q  Okay. And there came a time after this accident
17 occurred when you completed an accident report?
18 A  Yes, ma'am.
19 Q  Do you remember when you completed that report?
20 A  I didn't, I didn't do the report, ma'am.
21 Q  You didn't?
22 A  No.
23 Q  Did you sign the report?
24 A  I can't sign if it I didn't do it.
25 Q  Really? Okay. All right.